UNITED STATES of America

v.

Louis E. WOLFSON, Elkin B. Gerbert,
Defendants.

No. 66 Cr. 720.

United States District Court
S. D. New York.

Dec. 2, 1968.

See also, 2 Cir., 405 F.2d 779.

Hogan & Hartson, Washington, D. C.,
for defendant Louis E. Wolfson; William
O. Bittman, Austin Mittler, Washington,
D. C., of counsel.

Arnold & Porter, Washington, D. C.,
for defendant Elkin B. Gerbert; Edgar
H. Brenner, James E. Krier, Washington,
D. C., of counsel.

Robert M. Morgenthau, U. S. Atty.,
Southern District of New York, New
York City, for the United States; Paul
R. Grand, Asst. U. S. Atty., of counsel.

PALMIERI, District Judge.

### Preliminary Statement

The defendants move for a new trial
based upon newly discovered evidence,
pursuant to Rule 33, Fed.R.Crim.P. The
defendants assert in their motion papers
that Government's Exhibit 21, a memo-
randum of an interview with the defend-
ant Wolfson and others which occurred
on October 12, 1950, was a fabricated
document. It bears the signature of the
then Regional Administrator of the Se-
curities and Exchange Commission at
Washington, D. C., Mr. E. Russel Kelly,[1]
and was dated October 16, 1950, four
days after the interview took place. The
charge of fraud and fabrication made by
the defendants on this motion rests upon
the asserted premise that the government
watermarks on the paper used in this
eight page document did not come into
existence until 1952, or thereafter.[2]

After considering the papers submit-
ted upon the defendants' motion, this
Court decided to hold an evidentiary
hearing. This hearing began on Novem-
ber 12, 1968, and was concluded on No-
vember 20, 1968. The Court now has
before it a large number of exhibits sub-

---

1. Mr. Kelly died in 1956.

2. The confidential information upon which
Wolfson's counsel assertedly acted in
bringing the motion was that the memo-
randum was prepared "after 1964 and
specifically for use in the Continental
case." No evidence was introduced at
the hearing which could be construed as
support for this statement.

mitted by both sides and a hearing record of 1447 pages.

A brief description of the trial context in which this exhibit was used is essential to a proper understanding of the proceedings on this motion.

At the trial, the defendants Wolfson and Gerbert were charged with conspiring to violate the registration provisions of the Securities Act of 1933, 15 U.S.C. § 77e(a), in connection with the illegal distribution to the public of common stock of Continental Enterprises, Inc. Additionally, the defendants were charged with substantive violations of these provisions in eighteen counts in connection with eighteen separate sales of Continental Enterprises, Inc. stock to the public. The jury returned verdicts of guilty as to both defendants on all counts on September 29, 1967. Both defendants were sentenced to prison terms and to fines, on November 28, 1967, when judgments of conviction were entered in this court.[3] The appeals from these judgments are now *sub judice* before the Court of Appeals.[4] The defendants are presently at large on bail pending the determination of their appeals.

Upon the trial both defendants took the stand. They asserted by their testimony and by contentions of counsel that they had no knowledge of the registration requirements. They claimed that they were too busy in the conduct of their extensive business affairs to be concerned with the details of the securities laws and regulations; that they had never heard of Section 5 of the Securities Act of 1933; and that they relied upon others in matters of regulatory compliance.

To counter the position taken by the defendants at the trial, the Government called as a rebuttal witness Mr. James Duncan, an attorney and former Assistant Regional Administrator of the Washington Office of the Securities and Exchange Commission. Mr. Duncan, a man of advanced years, was retired from government service at the time of his testimony. Having refreshed his recollection from the memorandum of interview (Government's Exhibit 21), he testified from his recollection of what had occurred while he was present at the meeting. He also testified concerning office practices with respect to the preparation of memoranda of such interviews, and on the strength of his testimony Government's exhibit 21 was admitted into evidence.[5] The testimony of Mr. Duncan and the receipt of this exhibit into evidence tended to establish that Mr. Wolfson was indeed aware of the registration requirements of which he had previously claimed ignorance, since the pertinent regulations, and section 5 itself, were the very subject of the interview.

Mr. Duncan's testimony at the trial has, by stipulation, been made a part of these proceedings. The defendants have attacked it as false, although they have suggested no basis for impugning the integrity of Mr. Duncan, apart from the

---

3. Wolfson was sentenced to serve a term of imprisonment of one year on each count, to run concurrently, to pay fines of $10,000 on count 1 and $5,000 on each of the substantive counts, and to pay the costs of the prosecution. The defendant Gerbert was sentenced to six months' imprisonment on each count, to run concurrently, to pay a fine of $5,000 on count 1 and $2,500 on each of the substantive counts.

4. The defendants have moved before the Court of Appeals to stay its decision pending the adjudication of their motion for a new trial. Rule 33, Fed.R. Crim.P., provides that when a motion for a new trial has been made in a case in which an appeal is pending, this Court may grant the motion only on remand of the case. Since, however, the motion is denied, remand does not appear to be requisite.

5. The portion of the interview reflected by Government Exhibit 21 at which Mr. Duncan was not present was not offered in evidence by the Government at the trial. This exhibit appears in the record of these proceedings as Government's Exhibits 11 through 18, each of the eight pages having been separately marked. The three copies have been marked Government's Exhibits 18a, 18b and 18c in these proceedings.

strictures levelled at the memorandum of interview. It is reasonable to assume that the jury believed Mr. Duncan's testimony and rejected at least that portion of defendant Wolfson's testimony which was inconsistent with it. This Court accepts Mr. Duncan's testimony as credible and persuasive.

Any recollection of other persons present at the interview, other than Mr. Duncan, was not available to the Court upon the evidentiary hearing. As above indicated, Mr. Kelly died many years before the trial and the hearing. Mr. Doran Weinstein, whose telephone call arranged the interview which he also attended, and who was a business associate of the defendant Wolfson, was not called as a witness, although he was available to the defense as well as the Government. The defendant Wolfson was questioned about the interview when he testified at the trial and his testimony was that he had no recollection of it. The four persons present at the interview, Messrs. Kelly, Duncan, Wolfson and Weinstein, are thus accounted for.

Thelma Spencer McLaughlin, a former stenographer employed by the Securities and Exchange Commission at the Washington office in 1950 and known at that time by her maiden name, Thelma Louise Spencer, was called by the Government as a witness at the hearing. She testified that she remembered the visit of Mr. Wolfson at the time of the interview and that she recognized the interview memorandum as having been typed by her. Further, she identified both the signatures and initials of Mr. Kelly and her own initials on various papers prepared at about the same time and having to do with the subject matter of the interview. Mrs. McLaughlin, now the mother of three children, has long been separated from government service and was a credible, disinterested and persuasive witness. Indeed, the impact of her

testimony was dramatic. She was not cross-examined and her testimony was not impunged. Standing alone, Mrs. McLaughlin's testimony would be sufficient to establish that the questioned memorandum of interview was indeed prepared and filed in October 1950, following the interview with Mr. Wolfson, and that the document was not fabricated. Not a single reference is made to her testimony in the proposed findings submitted in behalf of the defendants.

The memorandum of interview now attacked as spurious has been subjected to extensive scientific tests and examinations. The testimony concerning them forms a part of the record now before this Court. Additionally, much evidence has been adduced by the Government with respect to the circumstances surrounding the preparation of this document, as well as its custody and control during the period of approximately fifteen years since it was prepared and filed. It is highly significant that four copies of this document were transmitted to four different addressees by its author, Mr. Kelly, and that three of these four copies have been recovered and introduced into evidence upon the hearing. One of them, a copy transmitted to the Regional Administrator of the Securities and Exchange Commission at Atlanta, Georgia, was filed in the Atlanta office along with numerous documents relating to Capital Transit stock, the stock affected by the general subject matter of the interview.

The findings and conclusions which follow are intended to amplify and supplement what has already been said and to demonstrate that the defendants have failed to establish that Government Exhibit 21 was fabricated or that it was prepared in 1952 or subsequent thereto.[6]

I.  THE CIRCUMSTANCES SURROUNDING THE PREPARA-

6. The motion has been pressed by the defendant Wolfson. The defendant Gerbert, while represented by counsel, has acted more in the role of an interested spectator and has not actively participated in the proceedings. Both defendants voluntarily absented themselves from the proceedings after having been advised by counsel of their right to be present.

TION, USE AND FILING OF THE WOLFSON INTERVIEW MEMORANDUM ALL INDICATE THAT IT CAME INTO BEING AT ABOUT THE SAME TIME AS THE INTERVIEW TO WHICH IT RELATES AND HAS BEEN IN APPROPRIATE AND SAFE CUSTODY SINCE THAT TIME.

A. *The Preparation, Custody and Control of the Questioned Document and Its Carbon Copies.*

1. Mr. James J. Duncan, former Regional Administrator of the Washington office of the Securities and Exchange Commission, testified at the Continental trial that he was present with Mr. Kelly, the Regional Administrator on October 12, 1950, during an interview of the defendant Louis E. Wolfson and one Doran Weinstein, a friend and associate of Wolfson, at the Washington, D. C. Regional Office of the Securities and Exchange Commission. He described the subjects of discussion and the lengthy explanation of the registration provisions of the Securities Act afforded Wolfson during the course of the meeting.

2. Mr. Duncan further testified that Mr. Kelly, who died in 1956, prepared a memorandum of the interview within a few days of the meeting. He identified Government Exhibit 21 as that memorandum. He added that he checked the interview memorandum for accuracy at the time and that it was thereafter placed in the files.

3. Although it is defendant Wolfson's claim on this motion that Mr. Duncan gave false testimony, Mr. Duncan's statements were not shaken in any way, nor was the impact of his testimony weakened by any suggestion of bias, prejudice or motive to give false or biased testimony. Mr. Duncan, an attorney, had been retired from government service for nine years at the time of his appearance on the witness stand in the Continental case and was not shown to have had any interest in the prosecution.

4. Thelma Spencer McLaughlin, the former Thelma Louise Spencer, a typist employed at the Washington, D. C., Regional Office of the Securities and Exchange Commission in October 1950, typed the interview memorandum, as well as a number of carbon copies, on October 16, 1950. She appeared as a witness at the hearing and gave substantially the following testimony. It was her practice to place her initials "TLS" on all copies of memoranda or letters typed by her, but not on originals. After her marriage in 1951, when she became Mrs. McLaughlin, it was her practice to place the initials "TM" on copies of documents typed by her. She did not, after her marriage, ever revert to the use of the initials of her maiden name. She acted as Mr. Kelly's stenographer in 1950 and was able to recall the occurrence of the interview and the subject matter of the interview because it generated a considerable amount of work for her. She was able to recall the physical presence of the defendant Wolfson at the office at the time of the interview as he passed her desk in order to gain access to Mr. Kelly's office where the interview took place. She never back dated a document at any time in her career. She was familiar with the printed ink corrections on the carbon copies of the memorandum which she testified looked like her printing. She recognized her typed initials on the copies indicating that she was the typist. She also recognized a number of details peculiar to her style and spacing which indicated that the memorandum conformed to the style customarily used by her in the preparation of similar documents. She also recalled office conversations the subject of which is reflected in portions of the memorandum.

5. Mrs. McLaughlin was an entirely credible and persuasive witness. She was not cross-examined at the evidentiary hearing, nor has she even been mentioned in the submission of final papers in behalf of the defendants at the close of the evidentiary hearing.

Mrs. McLaughlin, at the time of her testimony, had been retired from govern-

ment service for over fourteen years, is the mother of three children, and was a disinterested witness. There has been no suggestion that her testimony was prompted by any bias or prejudice.

B. *The Requisition of the W–525 File and the Removal of the Questioned Document for Its Eventual Use Before this Court.*

6. Stuart Allen is a financial analyst on the staff of the Securities and Exchange Commission and was assigned to the investigation which eventually led to the prosecution of the defendants in the Continental Enterprises, Inc. case. He testified at the trial and at the evidentiary hearing to technical and formal matters. He testified cogently and persuasively and no basis can be found either in the trial record or the record of the evidentiary hearing for attributing any bias or prejudice to him other than his connection with the Securities and Exchange Commission.

On December 14, 1965, Mr. Allen obtained from the Federal Records Center where closed files are stored the files of Capital Transit Company. Among these files was a file designated "W–525" which is presently charged to him. This file had been opened on August 30, 1950 and closed on April 18, 1951. The questioned document was found in this file by Mr. Allen. It was located in chronological sequence between documents dated October 6th and 16th, 1950.

7. In the course of preparing a report relating to the Continental Enterprises matter for referral to the Justice Department for criminal prosecution, Mr. Allen sent the file to the Xerox department of the Securities and Exchange Commission with the request that xerox copies be made of the questioned document. These copies were marked as exhibits to the criminal reference report and the file was returned to Mr. Allen intact. The xerox copies were made between December 1965 and March 1966.

8. File W–525 was among the files delivered to the office of the United States Attorney for the Southern District of New York after the matter was referred to the Justice Department. Assistant United States Attorney Michael F. Armstrong, the prosecutor charged with responsibility for the case, removed the questioned document from the W–525 file in April or May, 1967. Mr. Armstrong placed a piece of yellow foolscrap paper in the file, with appropriate notations, indicating that he had removed the document.

C. *A Carbon Copy of the Wolfson Interview Memorandum was Stored in the Atlanta, Georgia Records Center and has Remained in Continuous and Safe Custody Since 1950.*

9. William Green is the Regional Administrator of the Atlanta, Georgia, office of the Securities and Exchange Commission. He has held this position since 1935. He was a credible witness and his testimony was not impugned in any way.

10. Starting in September, 1950, Mr. Green undertook, at the request of Mr. E. Russel Kelly, an investigation of transactions in the stock of Capital Transit Company, an enterprise with which the defendant Louis E. Wolfson was associated. He maintained a file on the matter which was eventually sent to the Federal Records Center at Atlanta, Georgia, in 1958. This file was withdrawn from the Records Center on October 15, 1968, at the request of Stuart Allen on instructions from Assistant United States Attorney Paul R. Grand. The records of the Atlanta office of the Securities and Exchange Commission do not indicate that this file had ever been removed from the Records Center prior to this time.

11. Mr. Green initialed each page in the file and forwarded it to Mr. Grand. Thereafter Government Exhibit 18–B was removed from the file, along with an attached covering letter. This exhibit consists of an exact carbon copy of the questioned Wolfson interview memorandum and a covering letter addressed to Mr. Green by Mr. Kelly dated October 16, 1950, in which it is stated that he is enclosing a copy of a memorandum of in-

terview of Louis E. Wolfson and Doran Weinstein. Both documents are signed by Mr. Kelly and bear date stamps reflecting their receipt in the Atlanta Regional Office on October 18, 1950. It was the practice of the Atlanta office to date stamp every document upon receipt at that office.

12. The file maintained by Mr. Green also contained a copy of Mr. Green's acknowledgment of the receipt of the questioned memorandum by letter to Mr. Kelly dated October 18, 1950. Mr. Green identified his signature on the original, which bears the Washington Regional Office date stamp showing its receipt on October 20, 1950.

13. Finally, the Atlanta file contained a second letter from Mr. Kelly to Mr. Green, dated October 16, 1950, which referred to the transmittal under separate cover to Mr. Green of the questioned Wolfson interview memorandum. This letter too bears a date stamp of the Atlanta Regional Office indicating its receipt on October 18, 1950.

D. *The Additional Copies of the Questioned Document Sent to Other Persons and Correspondence Related Thereto All Indicate the Normal Handling of the Interview Memorandum Prepared in 1950.*

14. A skeleton file consolidated with the main W–525 file revealed the existence of an additional carbon copy of the questioned document attached to a covering letter from E. Russel Kelly to Mr. Anthon Lund. This document was removed by Mr. Allen in the presence of Mr. Green in October 1968 at the Alcohol and Tobacco Tax Division Laboratory in Washington, D. C., for purposes of ink analysis of the E. Russel Kelly signatures.

15. The carbon copy referred to in the previous finding and other carbon copies were typed by Mrs. McLaughlin at the same time as the original. The carbon copies of various covering letters bear the initials then used by Mrs. McLaughlin, namely, "TLS".

16. Both the covering letter and the first page of the copy of the questioned document sent to Mr. Anthon Lund bear a Securities and Exchange Commission date stamp showing their receipt on November 14, 1950, by the L. & E. Records Unit (Litigation and Enforcement), a part of the Trading and Exchanges Division which has since been renamed Trading and Markets Division. The impression was made by the Securities and Exchange Commission stamp in use from 1950 to 1952.

17. In addition to the original covering letter signed by Mr. E. Russel Kelly and located in the skeleton file, a file copy of this letter marked E.R.K. was found in the main W–525 file.

18. A third carbon copy of the Wolfson interview memorandum was located by Mr. Allen in the Universal Marion file of the Securities and Exchange Commission designated 132–3. Universal Marion Corporation, of which Louis E. Wolfson is a controlling stockholder, was the successor corporation to Capital Transit Company. This third copy and the covering letter to which it is attached were removed from the file by Mr. Grand in Mr. Allen's presence at the Alcohol and Tobacco Tax Division Laboratory in October 1968. While no date stamps appear on the covering letter or memorandum, the covering letter bears the following pencilled notation: "Noted Goode" and pages 2, 4 and 7 of the attached memorandum bear pencil marks which appear in the margin next to portions in the text.

19. A carbon copy of Mr. Kelly's covering letter to Mr. Goode, initialed "E.R. K." in blue-black ink, was introduced at the hearing and was removed from the main W–525 file in October 1968.

20. The evidence adduced at the hearing demonstrates without question the existence of three separate and distinct carbon copies of the questioned interview memorandum, together with covering letters, located in three different files, one of which had been in storage for many years many hundreds of miles from

Washington, D. C. This is evidence of a most compelling nature supporting the authenticity of the questioned document. The date stamp impressions on two of the three copies, indicating their receipt in separate Securities and Exchange Commission offices in the fall of 1950, constitute additional evidence of the authenticity of the questioned document. No question has been raised with respect to the authenticity of the date stamp impressions.

*E. The Evidence as to the Genuineness of the Signature of E. Russel Kelly.*

21. The signature of E. Russel Kelly appearing on the questioned document, as well as similar signatures on other exhibits in evidence, are all genuine signatures of Mr. E. Russel Kelly, former Regional Administrator of the Washington, D. C., Regional Office of the Securities and Exchange Commission. The initials "E.R. K." on the exhibits in evidence are genuine initials of Mr. E. Russel Kelly. This is the case with respect to the signatures not only on the last page of the questioned document but on the three carbon copies thereof and on the covering letters relating to those copies. The defendants have failed to prove the lack of authenticity of these signatures or of these initials.

22. While the signature of E. Russel Kelly on the eighth page of the questioned document was perforated by minute syringe holes for the purpose of obtaining ink samples after this motion was brought, these perforations did not prevent the defendants from obtaining adequate and sufficient discovery for the purpose of investigating the authenticity of the signature. The holes in question are invisible to the naked eye under normal lighting conditions. It is only when the signature is held against a strong light that they can be discerned. When defendants' experts examined the original document and were permitted to photograph it in June and July, 1968, the signature was not perforated. In addition, the defendants have had available to them a number of sample signatures of E. Russel Kelly which were not per-

forated and the authenticity of which they have not questioned.

*F. The Document in Question Comes from One Source and Was Typed at One Time.*

23. The parties have not disputed the fact that the type style of each of the eight pages of the questioned document was originally designed by the Remington Company, was designated Remington "4-A Type Design" and was available from the 1930's on.

24. Office equipment records maintained by the Securities and Exchange Commission reflect the purchase of a typewriter equipped with this type, Serial No. 2538896, on May 11, 1940, and its location in the Washington Regional Office of which Mr. E. Russel Kelly was Regional Administrator. They further reflect that it was traded in on December 4, 1958. This evidence supports an inference that the questioned memorandum was typed by the use of this machine.

25. Mr. Sidney Goldblatt was called as an expert witness by the Government and his testimony was entirely credible and persuasive. He has been a Questioned Document Examiner with the United States Treasury Department for the last eighteen years. He examined and photographed eighteen samples of the signature of E. Russel Kelly (including the initials "E.R.K.") found in the files of the Securities and Exchange Commission, including the signatures on the last page of the questioned document and the three carbon copies thereof, and the covering letters which were marked in evidence. His testimony to the effect that all the signatures of E. Russel Kelly were made by one and the same person is accepted by this Court and constitutes persuasive evidence of the genuineness of the memorandum.

26. Mr. Goldblatt also examined each word of the questioned document in detail, observed the characteristics of the type on each page, including shading, ribbon color tone, malalignments, and distortions of letters, and expressed his unqualified expert judgment that each

of the eight pages was typed on the same typewriter and at the same time. His testimony is accepted by the Court as valid and persuasive.

### G. Neutron Activation Analysis.

27. The Government introduced evidence to establish the integrity of the questioned document by a test known as a neutron activation analysis. This is a relatively new test which as yet is not based upon extensive experience. It is intended as a means of analyzing and determining the elemental composition of matter. The test involves taking samples from the questioned matter, placing them in a nuclear reactor thereby making them radioactive, and then using complex equipment to measure the radioactivity which the samples emit. Because of the nature and properties of radioactive materials, the measurement of emitted radioactivity is used to determine which chemical elements are present in the sample and the quantity of each which is present. This method of analysis is said to reveal the presence of seventy-five of the one hundred and three chemical elements known to man and can measure quantities as minute as one-thousandth of a millionth of a gram. While the tests performed by Mr. C. Michael Hoffman, a research chemist employed by the Treasury Department, Alcohol and Tobacco Tax Division, were of great interest, his conclusions, while not rejected, have not been placed in the balance in view of the credible evidence introduced by the defendants through Dr. Vincent Guinn, that the reliability of this test is open to question in the light of its relatively recent origin and the necessarily limited experience connected therewith.

### H. Ink Analysis.

28. The expert testimony of Mr. Richard Brunelle, a research chemist of the Alcohol and Tobacco Tax Division Laboratory of the United States Treasury Department, is accepted by this Court as valid and persuasive. Mr. Brunelle expressed his unqualified judgment that the ink in the E. Russel Kelly signatures on the original and on each carbon copy of the questioned document and the three carbon copies related thereto was one and the same blue-black ink.

### I. The Watermark Evidence.

29. The principal argument made by the defendants in support of their charge of spuriousness rests upon the assertion that the watermark designs which appear in the paper on which the questioned memorandum was typed were first made in 1952 or thereafter, two years or more after the date appearing on the document.

30. A watermark is a design placed on the paper by the manufacturer for the purpose of identification. The watermarking device itself is a raised metallic design which, when pressed against the paper during the manufacturing process, leaves an imprint of the design. This process is accomplished through the use of a dandy roll, a hollow tubular device about six feet long which consists of a metal frame covered by a mesh-like screen. Upon this screen a number of the raised metallic designs are attached, so that when the wet paper in process comes into contact with the dandy roll, the watermark imprint results.

31. It is common ground that the watermark design appearing in the pages of the questioned document (Government's Exhibits 11 through 18) is a product of the J. J. Plank Corporation of Appleton, Wisconsin.

32. The watermark design just referred to is the government seal one star watermark. It is a representation of the Great Seal of the United States. The predominant feature is the American bald eagle with wings outspread. It holds the center of a flowing ribbon in its beak. In its right claw the eagle holds a cluster of olive leaves; in its left it holds a sheaf of five arrows. Just above and slightly to the side of the arrows held in the eagle's claw there is a cluster of four arrows with short shafts. A shield, containing a series of vertical lines, replaces most of the body of the eagle. The number of stars appearing directly above the eagle's head denotes

the rag content of the paper. The stars are added separately prior to the imprinting of the watermarks and by general agreement are not regarded as distinguishing characteristics.

33. The J. J. Plank Corporation has employed two methods of making watermarks. The first is the bent wire method. Plank manufactured government seal watermarks by this method from the 1930's through November of 1955. Bent wire watermarks are made by hand bending and cutting approximately 50 pieces of wire to the desired shapes, following a blueprint-like design, and individually soldering each of these wires to the dandy roll.

34. The second method of constructing watermarks is the electrotype method. These watermarks are constructed by using metal dies, which stamp out the designs which are later appended to the dandy roll. Plank began to manufacture watermarks by the electrotype method in 1940.

35. Plank has used three different dies to produce electrotypes since 1940. The first began to be used in 1940, the second in 1952, and the third in 1956. There is no dispute that the 1952 design differed from the 1940 design in the following respects: arrows 4 and 5 in the bottom row were fused in the 1952 design, but not in the 1940 design; the top rows of arrows in the 1952 design were approximately $\frac{10}{32}$nds of an inch as opposed to $\frac{9}{32}$nds of an inch in the 1940 design; the arrangement of these arrows were slightly different.

36. From 1940 to 1956 Plank utilized both the bent wire and electrotype methods for constructing watermarks which they attached to their dandy rolls. The records of the J. J. Plank Corporation are not complete and do not furnish a reliable basis for attributing to any particular watermark the precise dates on which it was used. It does appear, however, that between 1940 and 1955 more watermarks were made by the bent wire method than by the electrotype method.

37. A crucial difference between the electrotype watermarks and the bent wire marks is that the electrotype marks, because they are all made from the same metal die, are identical in all critical respects. The bent wire marks, however, because they are individually made by hand, are subject to indeterminate variations attributable to the skill and care of the individual who constructs them. Watermarks made from the bent wire method cannot be precise or uniform and tend to show greater differences than watermarks made from the electrotype method.

38. Imperfections in the paper or mechanical irregularities during the process of imprinting the mark from the dandy roll to the wet paper, can result in differing impressions even when the same design is used. Such imperfections may be caused by "licks", literally a pickup or swiping of the wet fiber by the dandy roll or a piece of dirt or fiber on the dandy roll. The effect of a "lick" can be to blur the imprint left by the watermark and to create an impression which appears to be a part of the watermark but which is in fact caused by the fibrous accumulation. This often results in impressions which vary significantly from the original watermark design, and thus may render impossible identification of the design solely through examination of the imprint left on the paper.

39. The watermarks in question are not of good quality and are difficult to discern, even with the benefit of strong light and a polarized filter. The defendants' witness, Mr. Henry Steger, foreman of the watermark department of the J. J. Plank Corporation, testified upon cross-examination that the watermark impressions on all the pages of the document are of poor quality and difficult to identify by date with any reliability.

40. The defendants' two experts, Mrs. Pearl Tytell and Mr. William Krueger, based significant portions of their testimony concerning the Plank government seal watermark largely upon information provided by Mr. Steger. Mr. Steger has had no technical education and little for-

mal education. His background and experience are based principally on his long employment by the J. J. Plank Corporation. In many respects the testimony of these witnesses was contradictory and inconsistent with the conclusion that the watermark in question came into being in 1952 or thereafter. It was generally agreed by all the witnesses that on one page (page 5) the watermark could not be sufficiently discerned to permit any examination of it.

41. The bulk of the expert testimony offered in support of the motion was given by Henry Steger, William Kreuger, and Pearl Tytell. Mr. Steger, as noted above, is the foreman of the watermarking department of the J. J. Plank Corporation; Mr. Kreuger is an employee of the Institute of Paper Chemistry, and Mrs. Tytell is self-employed as a questioned documents expert. Despite the fact that both Mr. Kreuger and Mrs. Tytell are educated in the general subject matter of this inquiry, their experience with regard to questioned document disputes involving watermarks is limited, largely because disputes which center around watermarks rarely occur. For this reason, much of the knowledge these two witnesses have with regard to the watermarks in question was obtained from Henry Steger.

42. In his affidavit filed in support of this motion, Mr. Steger stated that the distinguishing features between the 1952 electrotype watermark and all other government seal watermarks made by Plank was the size of the arrows, the arrangement of the arrows, and the fusion of the two lower arrows. When he testified, however, he stated that he could distinguish between the electrotype design and a bent wire design by the length of the arrow shafts and the width of the bars in the shield. He further testified that each of the characteristics upon which he relied could be identical in an electrotype design and an individual bent wire design. There were, furthermore, inconsistencies in the testimony of Mr. Steger as to which arrows fused and on which pages. Mr. Steger's testimony was

inconsistent in important respects, and his testimony was inconsistent with his affidavit. His admission that each of the characteristics he relied upon to distinguish the 1952 electrotype mark are also found in bent wire marks, constrains the Court to find that his testimony lends no credence to the claim that the mark appearing on the memorandum is a 1952 J. J. Plank Corporation electrotype watermark.

43. The testimony of William Kreuger is not persuasive of the movants' contention that the watermark in question is a 1952 electrotype watermark. Although he testified to the fusion of arrows on certain of the pages, Mr. Kreuger also stated that the poor quality of the watermarks hindered proper identification. Furthermore, and more importantly, Kreuger testified that the features which would seem to indicate an electrotype design could also result from a bent wire watermark.

44. Mrs. Tytell based her conclusion that the marks are from an electrotype design on overlay tests which she performed. Because it is possible for a bent wire mark and an electrotype mark to overlay, however, this test cannot be accepted as probative.

45. Mrs. Tytell and her husband have received from the defendant Wolfson the sum of $62,000 for their services in this case. They also expect to receive $300 per day each for their presence in court at the hearing, and as they were both present on six days they expect to receive $3,600 more. Additionally, they are still owed something under $10,000, making a total of approximately $78,000. The large sums of money received and expected to be received by Mrs. Tytell and her husband from the defendant Wolfson make it doubtful that her testimony can be wholly objective and unbiased.

46. The moving affidavits in support of defendants' motion and in particular the joint affidavit of Mr. and Mrs. Tytell, refers only to metal dies producing electrotype copies of the watermark. There was no reference in these voluminous

moving papers to the bent wire method of making watermarks. This method was first mentioned in the Government's behalf in the answering affidavits. In consequence, a sharp issue was raised at the hearing as to whether the watermarks in question were made from electrotypes or by the bent wire method. The fact that the bent wire method was not even mentioned in the moving papers indicates at the very least that the motion was based upon an incomplete study of the problem. This is illustrated by the Tytells' unwarranted assumption that all the watermarks in question were made from electrotype dies.[7] The defendants' contention that the bent wire method of making watermarks was irrelevant to the conclusions of their experts is not accepted by the Court as valid.

47. Sidney Goldblatt, a questioned document expert employed by the United States Government, testified that the sheets of paper in question were not susceptible to dating through analysis of the watermarks because of their poor quality, and because the characteristics which would tend to indicate that the mark was made by a particular electrotype design could also be present in a bent wire design. His testimony is accepted as credible and persuasive notwithstanding the fact that his experience with watermarks, like that of Mr. Kreuger and Mrs. Tytell, was of a limited nature.

48. The proof is insufficient to establish that the watermarks on the sheets of paper making up the questioned document can be identified as a J. J. Plank Corporation 1952 electrotype design, or that they were made by the electrotype method. The records of the Plank Corporation were insufficient to provide any proof with a view to tracing the precise periods of time when the watermarks on the questioned document were used.

49. The evidence adduced at the hearing and by way of affidavit and which is inconsistent with the findings hereinabove set forth, is rejected by the Court as unpersuasive.

## CONCLUSION

1. The evidence does not sustain the claim that Government Exhibit 21 (Government Exhibits 11 through 18 of the hearing) is spurious, that the testimony of James Duncan is false, or that the Government seal watermark in the paper on which it was typed was produced from a design first made in 1952 or thereafter. Government Exhibit 21 is a valid and authentic document. Its allegedly spurious nature has not been demonstrated in any respect.

2. The motion for a new trial is denied. It is so ordered.

---

7. The following significant excerpt is taken from page 8 of their joint affidavit:

"* * * The Plank Corporation has made perceptible changes in their designs for the Government Seal watermark over the years. Each time the design is changed—often to accommodate technological improvements on the paper machines or to satisfy specific requests—a new drawing by an artist is made. The new drawing is used as the basis for a new die. Once the new design is introduced the old die is discarded and all orders thereafter received for Government Seal dandy rolls are filled by using the electros from the current die."