**In re Louis E. WOLFSON, Petitioner.**

**No. M 23–7/77.**

United States District Court,
S. D. New York.

June 15, 1978.

Rabinowitz, Boudin & Standard, New York City, for petitioner Wolfson; Victor Rabinowitz, Herbert Jordan, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for United States; Pamela R. Chepiga, Asst. U. S. Atty., of counsel.

## OPINION

PALMIERI, District Judge.

By its decision in *United States v. Wolfson,* 558 F.2d 59 (2d Cir. 1977), the Court of Appeals affirmed the decision of this Court denying an extensive *coram nobis* petition filed by Louis E. Wolfson. Wolfson, petitioner herein, stands twice convicted of felonies under the federal securities laws, first as a result of a jury verdict and later by his plea of *nolo contendere* to a felony under a separate indictment. As some familiarity with these convictions and the seemingly endless parade of post-conviction proceedings that has followed them is essential to an understanding of this opinion, a brief review of the history of the case is set forth in a footnote.[1]

1. On September 29, 1967, following a jury trial before this Court, petitioner was found guilty on nineteen counts of an indictment (66 Cr. 720) charging him with violating and conspiring to violate Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, in connection with the sale of unregistered stock of Continental Enterprises, Inc. (the "Continental case"). A motion for a new trial on the basis of newly discovered evidence was denied following an extended evidentiary hearing. *United States v. Wolfson,* 297 F.Supp. 881 (S.D.N.Y.1968). This motion rested upon what was perhaps the most dramatic and superficially plausible of Wolfson's many post-conviction charges; namely, his unproven assertion that the watermark on a key government exhibit introduced into evidence at his trial indicated that it was typed on paper that was not manufactured until years after the date it bore and that it was, therefore, a fraudulent and fabricated document. Wolfson's discredited watermark experts admitted they were paid a fee of approximately $78,000 for their services. 297 F.Supp. at 890. The investigation of this charge and the hearing which followed consumed much time and effort. Both the conviction and the denial of the motion for a new trial were affirmed on appeal. *United States v. Wolfson,* 405 F.2d 779 (2d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); *United States v. Wolfson,* 413 F.2d 804 (2d Cir. 1969). Petitioner was sentenced to concurrent prison terms of one year on each count, fined $100,000, and assessed the costs of prosecution under 28 U.S.C. § 1918(b). The fine and costs were paid and petitioner served his sentence in this case, being released in 1970.

Following his conviction in the Continental case, and after several unsuccessful motions for disqualification, see *Wolfson v. Palmieri,* 394 F.2d 7 and 396 F.2d 121 (2d Cir. 1968), petitioner was tried before this Court on a second indictment (66 Cr. 832) charging him with perjury, obstruction of justice, and fraud in the purchase and sale of the stock of the Merritt-Chapman & Scott Corporation (the "Merritt-Chapman case"). His conviction after trial in this case was reversed by a divided Court of Appeals. *United States v. Wolfson,* 437 F.2d 862 (2d Cir. 1970). Two subsequent trials before another judge of this court resulted in hung juries. Petitioner then entered a plea of *nolo contendere* to one count charging him with filing false statements with the Government, a felony, and paid a fine imposed by the court.

On May 16, 1975, petitioner filed a petition for a writ of error *coram nobis,* seeking to set aside his conviction in the Continental case. This petition was addressed to the Chief Judge of the Southern District of New York, who, denying petitioner's request that it be assigned to a judge other than the trial judge, assigned it to this Court. A subsequent motion for recusal was denied in opinions of this Court dated July 23, 1975, and September 16, 1975. This Court concluded that counsel's flagrant disregard of certain of its directions constituted a sufficient basis upon which to deny the petition with prejudice under Rule 41(b) of the Federal Rules of Civil Procedure, a sanction which the Court of Appeals would find "too severe." 558 F.2d at 65. The voluminous *coram nobis* petition was nonetheless heard on the merits, and, after considering some fifteen points raised by the petition, this Court denied it on the merits. Opinion of July 26, 1976.

On appeal, petitioner pressed only three of his claims, one of which was abandoned prior to argument. The Court of Appeals affirmed the denial of the *coram nobis* petition, holding that petitioner had failed to present sufficient evidence in support of his claims to warrant a hearing. With respect to the motion for recusal, the Court of Appeals concluded that there was "nothing in [this Court's] conduct in the *Continental, Merritt-Chapman* and coram nobis proceedings to give rise to a reasonable suspicion of bias," *United States v. Wolfson,* 558 F.2d 59, 64 (2d Cir. 1977), and accordingly affirmed this Court's denial of that motion.

The present petition was filed on November 10, 1977, designated as a "miscellaneous" mo-

Three motions are presently before this Court for decision. In the first, petitioner seeks leave to take the depositions of Messrs. Milton S. Gould and Seymour Glanzer, both members of the bar, for the purpose of perpetuating their testimony pursuant to Rule 27 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1651. Mr. Gould served as trial counsel for Wolfson in the Continental case. Mr. Glanzer had been employed as an attorney with the Securities and Exchange Commission. The second motion seeks an order, under Rule 6(e) of the Federal Rules of Criminal Procedure, disclosing the testimony given by Joseph M. Glickstein, a close friend, business associate, and attorney of Wolfson's, before the grand jury which indicted petitioner in *United States v. Wolfson,* No. 66 Cr. 720 (the Continental case). The stated purpose of these applications is to obtain evidence upon which to base a renewed petition for writ of error *coram nobis.* Lastly, petitioner, having earlier informally suggested recusal, at a later date formally moved that this Court disqualify itself from these proceedings on

the ground that "the impartiality of the presiding Judge . . . might reasonably be questioned." 28 U.S.C. § 455. These motions are considered separately below.

### The Motion for Recusal

■ As appears from the foregoing, this not the first time that this Court has had the painful duty of having to confront and resolve a suggestion of recusal in this case. Indeed, the conscientious discharge of that responsibility in the past has subjected this Court to an almost continuous barrage of attacks mounted by petitioner through a succession of attorneys from New York and Washington over a period of some eleven years. As a querulous accompaniment to his untiring efforts to overturn his conviction, petitioner has waged a campaign of vilification against this Court and the integrity of its processes [2]—a tactic only too frequent among convicted persons who prefer to blind themselves to jury verdicts and the evidence upon which their convictions rest

---

tion, and as such was assigned to another judge of this Court, who was then presiding over the miscellaneous docket. That judge subsequently referred the matter to this Court. While familiarizing itself with the papers, this Court requested counsel to send copies of all papers submitted to the Court to Messrs. Gould and Glanzer, persons with an obvious interest in these proceedings, along with a statement that "this action is taken at the request of [the] court with a view to their intervention in the matter as *amici curiae.*" This was done by the United States Attorney; Wolfson's attorney declined to do so. Subsequently, Messrs. Gould and Glanzer submitted letters, dated March 27, 1978 and March 20, 1978, respectively, to the United States Attorney, setting forth their lack of knowledge with respect to the matters referred to in the petition.

At a hearing held on April 7, 1978, a copy of the minutes of Glickstein's grand jury testimony was released by the Government into the custody of the Court. The Assistant United States Attorney was directed to secure sworn affidavits from Messrs. Gould and Glanzer setting forth in clear and concise form their statements with respect to the areas of inquiry outlined in petitioner's moving papers. Decision on petitioner's motions, including that for recusal, was reserved.

**2.** See, e. g., note 2 to this Court's opinion of July 26, 1976:

. . . [A] scurrilous letter [was circulated] by the petitioner, while the petition was *sub judice,* covering about 27 printed pages in which he accused the trial court of conducting "kangaroo" proceedings, of having shown favoritism to highly publicized criminals and mafia figures, and of having engaged in numerous other misdeeds. He also accused the prosecutor and an official of the S.E.C., as well as the trial court, of participating in a "scheme to frame" him and of "railroading" him, adding that he could fully document his charges, inviting a lawsuit if he could not prove them, and asserting his financial responsibility and lack of immunity. This letter has been placed under seal and made part of the record in these proceedings. At the February 19th meeting petitioner's counsel declined to concede that this letter was either libelous or scurrilous. The letter, addressed to the Editor of the New York Times, was circulated to two other New York daily newspapers, and to a number of persons occupying positions of importance in the legal profession and in Government.

This letter, referred to in the Court of Appeals' opinion at 558 F.2d 61 and 62, was submitted under seal to that Court as an example of petitioner's abusive tactics in attacking the Court. It was not part of the litigated record and no issue or contention was raised by petitioner with respect to it in this Court.

and to make the prosecutors and the trial court appear to be their personal enemies. While the more preposterous of his assertions have been confined to the extrajudicial forum, their spirit has surfaced in the many motions for recusal that have been made, all of the allegations in support of which have been uniformly determined to be legally insufficient by this Court, the Court of Appeals, or both.

With respect to petitioner's public charges, this Court has consistently avoided any joinder of issue, despite petitioner's invitation to stand financially responsible if unable to prove them.[3] As he undoubtedly realizes, the Court cannot involve itself in civil litigation with him. Moreover, this Court lacks the support provided by the jurisprudence of other countries whose laws provide for the imposition of penal sanctions for offensive conduct or language which tend to impair judicial authority or its official standing.[4]

With respect to the charges contained in the repeated motions for recusal, this Court has given them careful consideration and found them insufficient on several occasions to warrant the doubtful expedient of disqualification. The Court of Appeals' affirmance of the last such decision would seem to have put the matter finally to rest, were it not for a footnote contained in that Court's opinion, to wit:

> Moreover, it is always open to a judge, as we pointed out in *Wolfson v. Palmieri,* supra, 396 F.2d at 125, to step out voluntarily. This advice is even more practical

now, since the duty to sit notion has been removed from the statute . . . and no opprobrium should result from a judge who in good conscience chooses not to sit, even though the claim of bias is legally insufficient. . . . We do not suggest that there should be further proceedings in this case, but if they do occur, the preceding advice should apply.

558 F.2d at 64 n.17.

Anyone familiar with the proceedings in this case over the past decade would have been led ineluctably to interpret this footnote as an invitation to Wolfson to undertake yet another round in his vexatious post-conviction litigation, encouraged, perhaps, by the hope that this Court would abdicate in favor of a judge unfamiliar with the distressing history of this case. He has not been slow to accept the invitation. His papers and arguments ever since the publication of this footnote demonstrate his conviction that, notwithstanding the affirmance of the dismissal of his petition, everything stated in the text of the opinion has been emasculated by this footnote and that an appellate court has now discerned the "merits" of his position.

The present motion for recusal, however, must be denied. Without attempting to write an *apologia pro vita sua,* this Court remains confident that it has dealt with all aspects of this litigation fairly and circumspectly. No new grounds for disqualification have been advanced, with the exception of the alleged "harassment" by the

---

**3.** See note 2 *supra.*

**4.** See, e. g., Leukauf & Steininger, *Kommentar zum Strafgesetzbuch* § 116 (Eisenstadt, 1974) [Austria]; Servais & Mechelynck, 2 *Codes Belges* 57, Code Pénal, arts. 275, 276 (Bruxelles, Emile Bruylant, 1977) [Belgium]; *Code Pénal,* arts. 222–224 (Paris, Dalloz, 1977–78) [France]; Carnelutti *et al.,* eds., *Quattro Codici,* Codice Penale, art. 342 (Padova, 1976) [Italy]. Article 222 of the French Penal Code provides, for example:

> Lorsqu'un ou plusieurs magistrats de l'ordre administratif ou judiciaire, lorsqu'un ou plusieurs jurés auront reçu, dans l'exercice de leurs fonctions ou à l'occasion de cet exercice, quelque outrage par paroles, par écrit ou dessin non rendus publics, tendant, dans

ces divers cas, à inculper leur honneur ou leur délicatesse, celui qui leur aura adressé cet outrage sera puni d'un emprisonnement de quinze jours à deux ans.

> Si l'outrage par paroles a eu lieu à l'audience d'une cour ou d'un tribunal, l'emprisonnement sera de deux à cinq ans.

> [Any person who commits any contemptuous act, either orally, or in unpublished writing or drawing, tending to reflect upon the honor or dignity of one or more judicial or magisterial officers or jurors, in or because of the performance of their duties, shall be punished by jailing from fifteen days to two years.

> If the contempt has been committed orally at court, the punishment shall be jailing from two to five years.]

Court in directing counsel to inform Messrs. Gould and Glanzer of these proceedings and to invite their participation as *amici curiae.* Beyond noting the obvious and significant interest these gentlemen have in the instant motions as the intended subjects of the requested depositions, this latter charge requires little comment. The perceived threat that this "relatively simple motion may escalate into a complex multi-party litigation" is illustrative only of the hyperbole with which petitioner has routinely seen fit to embellish his papers.

One of the grounds for recusal unsuccessfully urged before the Court of Appeals, and reiterated in petitioner's most recent motion, relates to the circumstances of the imposition of sentence in the Merritt-Chapman case. These circumstances had been explained by this Court in footnote 8 of its July 23, 1975, opinion.[5] Wolfson's brief on appeal sought to make it appear that the Court forced him to leave his wife's deathbed by refusing to postpone the date of his sentence in an inconsiderate, peremptory exercise of its authority. While finding no merit to the claim, the Court of Appeals nevertheless quoted the abusive telegram sent to the Court by Wolfson (and set out in full in his appellate brief), despite its absence from the litigated record; and in its recitation of facts[6]—unsupported by

---

5. This footnote, which was reproduced as part of this Court's opinion in the appendix on appeal, reads as follows:

> Some time before December, 1968, the Court was made aware that Mrs. Wolfson was suffering from terminal cancer. The fixing of the date of sentence of petitioner in the Merritt-Chapman case, far from being made in 'wanton disregard' of Mrs. Wolfson's health, was made only after the Court, with consent of all counsel, was in direct contact on several occasions with Dr. Rand of Miami, the treating physician, with a view to fixing a date for sentence during a period of remission. The problem was further complicated by the fact that petitioner declined to travel by airplane thereby greatly extending the time of any absence from Florida. The sentence was set down for a late morning hour so as to permit petitioner to attend at court between his train arrival and departure at Pennsylvania Station on the same day. The date for sentence was fixed upon the recommendation of Dr. Rand that it was an appropriate time because he believed Mrs. Wolfson was in a period of remission. All counsel were informed of this. In short, the Court made a conscientious effort to deal compassionately with the problem of Mrs. Wolfson's illness.

6. In discussing the recusal motion, the Court states that Wolfson

> "also points to evidence of alleged bias not previously presented, such as the judge's *failure to postpone* the sentencing date in the Merritt-Chapman case *despite the fact that Mrs. Wolfson was fatally ill at the time . . .*"

558 F.2d at 61 (emphasis supplied).

A few lines later, the Court says:

> According to Wolfson, the antagonism between himself and Judge Palmieri is exemplified by a telegram which Wolfson sent to the Judge after the Merritt-Chapman sentencing, in which he pledged "to do everything to have you [Judge Palmieri] removed from the bench . . . ."

*Id.* Footnote 5 immediately follows this quote and states: "This telegram was sent shortly after the death of Wolfson's wife *which occurred the day after the sentencing.*" *Id.* n. 5 (emphasis supplied). In fact, Wolfson's telegram itself states that the death occurred the morning the telegram was sent, which was two days later.

Finally, the opinion states:

> . . . [T]he *record* shows that Judge Palmieri's timing of the sentencing in the Merritt-Chapman case was based on the report of Mrs. Wolfson's doctor that Mrs. Wolfson's condition had *improved somewhat.*

*Id.* at 63 (emphasis supplied).

This recitation of facts is directly contrary to the facts stated in this Court's findings, set forth above in footnote 5. Actually, Mrs. Wolfson had been suffering from cancer for a long time prior to the events in question; and despite the fact that sentence was imposed during a period when her attending physician considered her to be in remission, it was apparent to all concerned that her condition could have turned suddenly for the worse, so that no precaution could have effectively eliminated the possibility of her death occurring at any time, either during an absence of her husband or shortly after his return. Petitioner's brief before the Court of Appeals, which sought to demonstrate a causal connection between the fixing of the date of sentence and his wife's death, was a cruel calumny of this Court based upon a distortion and misstatement of the facts. It is unfortunate that the opinion of the Court of Appeals mirrored Wolfson's brief on this point, thereby endowing it with an unjustified verisimilitude. Even if that Court were disposed to adopt petitioner's factual assertions on appeal in preference to those of this Court, it is respectfully suggested that, at the very least, this Court should have been requested to

any reference to this Court's findings—lent an unfortunate air of credulity to Wolfson's allegations. No supporting reference was made ·to any formal motion for postponement, nor to the minutes of the sentencing proceedings. Nor could any have been made. The jury verdict was returned on August 8, 1968; sentence was not imposed until December 6, 1968. When one considers that Rule 32(a)(1) of the Federal Rules of Criminal Procedure requires that "sentence shall be imposed without unreasonable delay," these dates, without more, demonstrate that the sentence was indeed postponed. In point of fact, Wolfson first complained of the December 6 sentence date only after the death of his wife and has sedulously sought to exploit their unfortunate temporal proximity ever since. This Court rests upon the explanation provided in its opinion of July 23, 1975, and can only express its dismay that its recitation of the facts was ignored in contravention of the spirit, if not the letter, of the rule that "findings of fact shall not be set aside unless clearly erroneous." F.R.Civ.P. 52(a).

Petitioner's exhaustive post-conviction efforts have caused a considerable expenditure of judicial resources, to say nothing of the time and expense inflicted upon the United States Attorney and related agencies. He has left in his wake massive and complex records which would impose a heavy burden on any judge of this court assigned to the case. All of the Assistant United States Attorneys familiar with these proceedings have resigned and the Court understands that this is largely true with respect to the personnel of the Securities and Exchange Commission. The efficient administration of justice would have been frustrated by a decision to disqualify.

The Court is aware that the so-called "duty to sit" notion has been eliminated from the disqualification statute and has not based its decision on that notion. See this Court's Memorandum Opinion of September 16, 1975, at 4–5.[7] In any event, the absence of a duty to sit does not permit this Court to countenance judge-shopping or allow itself to be driven from the case. The Supreme Court has made it clear that the standing of a judge in a case cannot be damaged by attacks made against him.[8]

This Court has reflected upon the Court of Appeals' observation that a recusal would "render unnecessary the considerable time and effort expended by the district

make special findings in support of its position instead of being confronted by an enlarged record and conclusory statements to which it never had the opportunity to speak.

7. "In any event, while the new and revised statute on judicial disqualification (28 U.S.C. § 455) broadens the grounds for recusal and is intended to eliminate the 'duty to sit' concept, it has not changed the law to the extent petitioner suggests. The standard of the general disqualification provision, section 455(a), is still one of reasonableness and should not be interpreted to include a spurious or loosely based charge of partiality. The Senate Report, adopted by the House, makes this abundantly clear:

While the proposed legislation would remove the "duty to sit" concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.

At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. S.Rep. 93–419, 93d Cong. 1st Sess. 5 (1973); H.R.Rep. 93–1453, 93d Cong. 2d Sess. 5 (1974)."

8. ". . . we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case." *Mayberry v. Pennsylvania,* 400 U.S. 455, 463, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971); ". . . where acts of contempt are palpably aggravated by a personal attack upon the judge, in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed." *Cooke v. United States,* 267 U.S. 517, 539, 45 S.Ct. 390, 396, 69 L.Ed. 767 (1925).

court and by [the Court of Appeals] on the issue here and allow all concerned to focus exclusively on the merits of the collateral attack." 558 F.2d at 64. To the extent that this language implies that petitioner's claims may be meritorious, however, this Court is constrained to voice its disagreement. There has been no merit whatever to any of Wolfson's legal challenges over the past ten years and none is discernible now, as the ensuing discussion is intended to demonstrate. His continuous and baseless petitions constitute a wanton abuse of process for which he and his attorneys may well deserve appropriate penalties. See, for example, the recent decision of the Court of Appeals in *Chour v. Immigration and Naturalization Service*, No. 78–4017 (2d Cir. April 28, 1978), in which damages and double costs were assessed against a petitioner and his attorney for their "persistent pursuit of frivolous and completely meritless claims." Slip op. at 2840–41. A similar sentiment has recently been expressed in the context of post-conviction remedies. *See Silverman v. United States*, 556 F.2d 655 (2d Cir. 1977), which involved a motion to vacate a conviction under 28 U.S.C. § 2255. ["We cannot close this opinion without commenting upon the unnecessary waste of judicial time in the District Court and in this Court in being faced with what is a manifestly frivolous petition and a manifestly frivolous appeal." 556 F.2d at 659.]

Senior judges, of course, perform such duties as they are "willing and able to undertake." 28 U.S.C. § 294(b). More than once this Court has entertained the desire to be relieved of its burdens in this case. In its footnote 17, already referred to, the Court of Appeals advises that "no opprobrium should result from a judge who in good conscience chooses not to sit, even though the claim of bias is legally insufficient." Unfortunately, the result of its permitting Wolfson to speak to it from an enlarged

record which was not before this Court, of its apparent disregard of the "clearly erroneous" rule, and of itself quoting in a published opinion from Wolfson's abusive telegram to the Court notwithstanding its absence from the litigated record, was to close the door to any choice in good conscience not to sit. This Court feels that it was indeed bound in conscience to set the record straight after more than ten years of unrewarding efforts in this case. It will have done so by filing this opinion. It is only then that this Court can take leave of its responsibilities in this case in good conscience, and without opprobrium. Accordingly, after ruling on the motions presently *sub judice* and filing this opinion, this Court will address the Assignment Committee in the manner provided by Rule 15 of the Calendar Rules of this court[9] and request that any further responsibility for these proceedings be assigned to another judge of this Court. This step is taken with a painful awareness of the burdens it will surely impose upon an already overburdened active judge.

### The Present Petition

As with petitioner's grounds for urging this Court's disqualification, the grounds offered in support of his efforts to set aside his conviction in the Continental case have been sharply reduced in number by previous judicial decisions and now come down to two claims. The first involves the appearance of petitioner's close friend and longtime counsel, Joseph M. Glickstein, Sr., before the grand jury which ultimately indicted petitioner. (Glickstein had also been general counsel to some of the corporations involved in the grand jury investigation and was later an unindicted co-conspirator in the Merritt-Chapman case.) Petitioner claims not to have consented to this appearance nor to have been informed of it until afterwards. Citing such authorities as *In*

---

**9.** RULE 15. Transfers from Senior Judges

When an active judge becomes a senior judge of this court, or at such later time as he chooses, he shall keep as much of his existing docket as he desires and shall furnish the Chief Judge

with a list, according to category, of all cases which he desires to have transferred. The Assignment Committee shall then transfer such cases by distributing them equally, according to category and by lot, to each active judge.

*re Terkeltoub,* 256 F.Supp. 683 (S.D.N.Y. 1966) and *United States v. Colacurcio,* 499 F.2d 1401 (9th Cir. 1974), petitioner argues that "grave Fifth and Sixth Amendment issues are raised by the mere appearance of Glickstein before the grand jury on the day before his client was indicted," and that "the question whether the episode tainted Wolfson's trial and conviction" cannot be resolved until the substance of his testimony is known. While petitioner had unsuccessfully sought the disclosure of these minutes in this Court in connection with his general claim of ineffective assistance of counsel, the precise claim now asserted made its debut on appeal from this Court's denial of the *coram nobis* petition. In discussing this claim, the Court of Appeals expressed its sensitivity to the dangers posed by the challenged practice, but concluded that "the Government has the right to call an attorney before the grand jury and question him on unprivileged matters." 558 F.2d at 65. It held that "appellant's claim on this issue had insufficient factual support or likelihood of success, and the district court did not err in denying a hearing." *Id.* at 66. The Court of Appeals also noted that "at the time of the Continental trial, Wolfson was aware that his attorney had appeared before the grand jury, and yet this is apparently the first time this issue has been raised in almost ten years." *Id.* at 65 n.20.

As the second ground which is contended to entitle him to post-conviction relief, petitioner asserts that his chief trial counsel in the Continental case, Milton S. Gould, was at that time the knowing subject of a government investigation which created a conflict of interest and therefore disabled Gould from providing petitioner with effective assistance of counsel. This Court found no merit in this claim and declined to grant that aspect of petitioner's motion for "discovery" which sought production by the Government of "any Criminal Reference Report relating to . . . Gould." The Court of Appeals, in affirming this decision, stated that "appellant's petition presented little, aside from his own speculations, in support of the claim, and on this record he

was not entitled to a hearing on the issue." 558 F.2d at 65. The Court of Appeals also noted that "[n]o affidavit from the attorney was submitted, nor was there any explanation of why one was unavailable." *Id.*

In this posture of the case it is difficult to see how petitioner is entitled to any relief at all. Both of the claims which he asserts would be included in a renewed petition for *coram nobis* have been considered and found to be without merit by this Court and by the Court of Appeals, and petitioner has been found by both courts not entitled to a hearing on either issue. It is difficult to understand how petitioner can be entitled to anything more by way of discovery in the context of a pre-action motion than he was in the context of his previous *coram nobis* proceeding or would be in the anticipated proceeding.

Petitioner points to those aspects of the Court of Appeals' decision which appear to rely upon the evidentiary insufficiency of his allegations, and states that "[t]he purpose of the instant applications is to obtain the evidence which the court of appeals found wanting," implying that the Court of Appeals has in some way given its blessing to the present petition. If this indeed had been its intention, one might legitimately inquire why it chose not to remand the case for further proceedings.

Petitioner nonetheless argues that he is caught in a dilemma: namely, that his claims are found unavailing because of insufficient factual support, yet his efforts to obtain that factual support are equally unsuccessful. This "Catch-22" argument would appear to have a certain initial plausibility. However, the fundamental issue behind it, freed of its procedural trappings, is the extent to which petitioner is entitled to conduct discovery in support of his allegations in actions collaterally attacking his conviction, and what threshold showings are necessary, beyond mere uncorroborated speculations, in order to establish this entitlement. The last decision of the Court of Appeals would seem at least implicitly to have settled this issue in support of the conclusion that petitioner has not crossed

the requisite evidentiary threshold and that he is not entitled to the aid of the court in his attempts to do so. This conclusion is consonant with the extraordinary nature of the relief sought, the late date at which the underlying allegations have been made, and the exhaustive treatment previously afforded to petitioner in his post-conviction litigation over a substantial period of time. With these observations in mind, this Court will proceed to the specific questions presented for decision.

### Disclosure of Grand Jury Minutes

■ Rule 6(e) of the Federal Rules of Criminal Procedure permits the disclosure of matters occurring before the grand jury "(i) when so directed by a court preliminarily to or in connection with a judicial proceeding . . .". Here, disclosure is sought preliminarily to petitioner's planned new *coram nobis* proceeding.

It has already been noted that the issue in connection with which this disclosure is sought may have been waived by petitioner's failure to raise it in a timely fashion. The affidavit of petitioner's counsel in the Continental case, Milton S. Gould, docketed as part of the record in this case, indicates that the matter of Glickstein's appearance before the grand jury had been discussed with petitioner prior to Glickstein's testimony. In any event, it is clear that petitioner was aware of Glickstein's grand jury appearance by the time of the Continental trial. This being so, the well-established rule that issues which were plainly available for consideration at trial or on appeal may not be raised for the first time in a collateral attack upon a conviction would seem applicable. See *Williams v. United States,* 463 F.2d 1183, 1184 (2d Cir.), *cert. denied,* 409 U.S. 967, 93 S.Ct. 299, 34 L.Ed.2d 232 (1972). Moreover, this Court's *in camera* inspection of the grand jury minutes has led it to conclude that they are not probative of anything supportive of petitioner's claim and that in fact petitioner's rights were assiduously protected both by the Assistant United States Attorney and by the witness' invocation of the attorney-client privilege.

Despite the apparent flaws, both procedural and substantive, in petitioner's underlying claim, this Court nonetheless has reached the conclusion that the ends of justice will be better served by the disclosure of Glickstein's grand jury testimony than by its continued secrecy. Disclosure, of course, is not a matter of routine, but rather involves a careful balancing by the court of a variety of interests and policies. *See, e. g., In re Biaggi,* 478 F.2d 489, 491–2 (2d Cir. 1973). Here, the witness whose testimony is sought to be disclosed professes an absence of recollection with respect to the substance of his testimony (although he does claim to have "invoked the attorney-client privilege where appropriate") and has consented to its disclosure. Those policies which seek to protect grand jury witnesses, then, are inapplicable, and the Government has interposed no strong objections to disclosure except on general policy grounds. On the other hand, petitioner alleges a substantial need for disclosure, seeking information he claims is necessary to prove his allegations, and asserts the public interest in "putting this controversy to rest once and for all, one way or the other." This Court cannot but join in this latter sentiment. Indeed, the decision which it now makes is primarily motivated by the desire to dispel the atmosphere, however groundless, of suspicion and accusation which has prevailed far too long in this litigation. The United States Attorney, therefore, is directed to make available for copying by petitioner the transcript of Glickstein's grand jury testimony. A copy has been marked as an exhibit in these proceedings for any eventual scrutiny by the Court of Appeals.

### Leave to Take Depositions

■ In addition to suffering from the general defects in theory noted above, petitioner's Rule 27 motion does not contain allegations sufficient to entitle him to the relief which he seeks. Even if he were somehow otherwise entitled to the aid of the Court in obtaining "the evidence which

the Court of Appeals found wanting," the present motion would have to be denied by virtue of several deficiencies which cannot be ignored.

Rule 27(a)(1) requires that a petition show: that the petitioner expects to be a party to an action cognizable in a court of the United States, *but is presently unable to bring it or cause it to be brought*" (emphasis added). An inability to bring the action to which the requested discovery would be relevant is thus an elementary prerequisite to the invocation of Rule 27. *See* 4 *Moore's Federal Practice* (2d ed.) ¶ 27.07[2]. The only reason offered by petitioner in support of his alleged inability to presently institute his planned *coram nobis* action is the anticipation—based no doubt upon the Court of Appeals' affirmance of this Court's rulings in his first such action— that it will be denied without a hearing on the ground of evidentiary insufficiency, if not on the ground of *res judicata,* and, implicitly, that no discovery of the sort here sought will be permitted. Beyond illustrating the twisted logic of the present petition, this conception of "inability," if accepted, would have the incongruous result of permitting discovery in advance of an action wherein such discovery would not be allowed. This cannot be the law, and petitioner has presented no authority in support of such a far-fetched interpretation of Rule 27.

Furthermore, the decisions construing Rule 27 make it clear that the purpose of the rule is to preserve and perpetuate known testimony, not to provide litigants with a vehicle for the ascertainment of evidence. *See, e. g., Petition of North Carolina,* 68 F.R.D. 410 (S.D.N.Y.1975); *Petition of Ferkauf,* 3 F.R.D. 89 (S.D.N.Y.1943); *Petition of Exstein,* 3 F.R.D. 242 (S.D.N.Y. 1942). See generally 4 *Moore's Federal Practice* (2d ed.) ¶ 27.04[4]. Petitioner here seeks to do precisely what the decisions do not permit. Moreover, there has been no allegation that the testimony here sought to be preserved is in danger of being lost, the prevention of which would appear to be the *raison d'être* of Rule 27. *See, e. g., Petition of North Carolina, supra,* 68 F.R.D. at 412; *Moore, supra,* at ¶ 27.04[4].

Perhaps anticipating the above objections, petitioner additionally argues that the relief sought may be granted under 28 U.S.C. § 1651 (the "All Writs" statute), Rule 6(a) of the Rules Governing Section 2255 Proceedings (which, by their title, would seem to apply only once a § 2255 or similar proceeding has been commenced), and Rule 15(a) of the Federal Rules of Criminal Procedure. Although there is considerable doubt that any of these provisions would provide an independent basis for the requested relief, it is clear that they are equally foreclosed by the above considerations.

Finally, the cases cited by petitioner do not support the conclusions he draws. *Mosseller v. United States,* 158 F.2d 380 (2d Cir. 1946), involved an appeal from a district court's grant of leave to take a deposition and held that it was not an abuse of discretion. There, the proposed deponent was, in sound medical opinion, likely to die before suit could be filed. The filing of suit was delayed by the fact that the underlying claim had to be denied administratively prior to the institution of a court action. *Harris v. Nelson,* 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), relied on 28 U.S.C. § 1651 to hold that the district court was free to authorize interrogatories or other suitable discovery in a *habeas corpus* proceeding, where Rule 33 of the Federal Rules of Civil Procedure was not available. However, the *habeas* proceeding there had already been commenced, unlike here, where the collateral attack is planned *in futuro.* *In re Sims,* 389 F.2d 148 (5th Cir. 1967), authorized Rule 27 depositions for use in a future post-conviction proceeding. There, however, the parties were "presently unable" to bring their actions because they had not yet exhausted their state remedies. All of these cases, then, involved situations in which a collateral attack was presently *sub judice,* or in which impediments external to the merits of the case prevented the litigants from bringing their actions immediately.

As previously noted, this Court directed that affidavits be secured from Messrs.

Gould and Glanzer. These have now been received, and have been docketed as part of the record. In addition to concluding that petitioner has failed to establish any entitlement to an order granting him leave to take depositions, this Court is satisfied that the submitted affidavits more than adequately respond to petitioner's allegations. Petitioner has failed to give any specific content to his conclusory statement that "[a]s any practitioner knows, an affidavit, artfully prepared in the calm of his office, is no substitute for the probing questions of counsel." The affiants, both attorneys of some distinction, have responded unequivocally to the narrow questions sought to be made the subject of depositions, and there is no reason to believe that their responses would be altered under the "probing questions of counsel," even if such a probe were within petitioner's rights.

### Conclusion

Petitioner's motion for recusal is denied. His motion for disclosure of grand jury minutes is granted. The use, if any, to which these minutes may be put and their substantive significance in any future proceeding are matters to which this Court need not address itself. Petitioner's motion for leave to take depositions is denied.

It is so ordered.